ALMA A. G. ROUSSIN, *Adm'x v.* BERNADETTE BLOOD.

*Keefe & Varney* and *Charles H. Authier* (of Maine), (*Mr. Varney* orally), for the plaintiff.

*Jeremy R. Waldron* and *Wyman P. Boynton* (*Mr. Boynton* orally), for the defendant.

PAGE, J. There was evidence that the deceased had an expectancy of life of 13.47 years and that his average earnings for the last six months of his life were $28.77 a week, while fulltime pay would have been $29.04. He was in good physical condition and he worked steadily.

In the course of argument, plaintiff's counsel explained to the jury that in assessing damages they must deduct from the prospective earnings of the deceased what it would have cost him to live. Then he continued.

"Now what figure you gentlemen will decide on of course is up to you. You are twelve reasonable men and you will consider that but let me suggest to you that if you take twenty-eight dollars a week and some cents and you should say it would cost him ten dollars a week to live—*Mr. Waldron:* I object. *Mr. Varney:* You may have your exception. *Court:* Only argument. *Mr. Varney:* It is for you to say, gentlemen, what you say it would cost him to live. But I am just going to say, say you should say it would cost him ten dollars a week to live—*Mr. Waldron:* Exception. *Mr. Varney:* Perhaps too little, perhaps too much, but it is for you to say, when you do that you take the balance if it is Eighteen Dollars a week, multiply it by fifty-two and if my figures are correct it will be nine hundred and thirty-six dollars a year, and if you multiply that by thirteen years, leaving off the odd cents, it would be twelve thousand one hundred and sixty-eight dollars from which you must deduct and I want you to be fair, from which you must deduct some figure because he is getting that money now rather than waiting for the thirteen years, from which you may deduct something because you may think that his earning capacity won't continue as high as that until the day of death though I submit to you the man of his physical condition and his age had all the prospects of working and having earning capacity for at least that much, for thirteen years more."

The defendant excepted to the last portion of this argument, but seems to have waived her exception. The court, reverting to the earlier portion, said: "I don't understand you are trying to testify what it would cost to live? Simply argument? *Mr. Varney:* That's all and I'll say to the gentlemen of the jury that the figures that I have used here I don't say that that's the right figure at all, I just use them for the sake of illustration only." .

At the time of the first interruption, defendant's counsel procured a ruling. Assuming that the court and parties understood that the defendant obtained an exception to this ruling because plaintiff's counsel said before the ruling, "You may have your exception" (which is open to great doubt), the repetition of the same argument was followed by another "exception", which was not noted by the court and upon which no ruling was made. But even if the exception had been taken properly, the jury could not have understood that the figure of $10 was stated as a testimonial assertion, but as an illustration which was to become the basis for an example in arithmetic. It was the sort of an example that the jury were entitled to have demonstrated in order that they might know how damages were to be calculated.

But the defendant says that she was entitled to a nonsuit because there was no evidence of the living expenses of the deceased, in consequence of which the jury had to depend entirely upon their imagination. It was in evidence that the Roussin family consisted of the deceased, his wife and a ten-year-old girl who had been living with them since infancy; that they lived well in a home owned by them, and that the deceased had driven an automobile for nearly twenty years. The jury could infer that the defendant's separate cost of living would have been somewhat less than half of his earnings, and that his dependents and his estate would have benefited by rather more than half of his earnings if he had lived. They were not left to pure conjecture in the matter. Their knowledge and experience of life and ordinary family benefits from the wage-earner's pay-envelope could be drawn upon. As will appear later, the jury seem actually to have found that the deceased would have consumed himself more than half of his earnings, or to have reckoned upon some diminution of his earnings in the future.

It is urged that the jury, who took the case prior to the decision in *Humphreys* v. *Ash, ante,* 223, were not told that they were to reckon the present worth of the losses of dependents and estate by discounting according to standard investment practices. They were told to discount, but not at what rate, nor was specific evidence given to them regarding the standard rate.

However the jury may have been supposed to have some knowledge of current interest rates. Most men know something about savings accounts and about the rates at which towns are able to borrow money. With such common knowledge the jury could have calculated the discount with approximate accuracy, and the verdict that

they gave is conformable to the rule laid down in *Humphreys* v. *Ash*.

Deducting from the verdict the funeral expenses of $540.15, it is apparent that $7,259.85 is the sum allowed as the value at the time of trial (a year after death) of the prospective earnings of the deceased for his dependents and his estate. Adopting rates of four, five and six per cent compounded, the defendant computes that there would be allowed for the weekly living expenses of the deceased the sums respectively of $13.42, $12.24 and $11.08. Certainly the first figure, being only a little less than half of the wages of the deceased, could have been adopted with some reason. The smaller sums reflect rates of five and six per cent which, we may take notice, are materially in excess of those current in standard investment practice.

Possibly a rate of three per cent would more nearly coincide with that practice. If that rate were taken, compounding annually, a sum slightly in excess of $12 a week would discount to the amount allowed in the verdict. Consequently an assumption that the deceased would have maintained his earning capacity for the remainder of his natural life would have left him the lion's share of $16. An assumption that his future earnings would average $23 a week would have assigned to his dependents and his estate only slightly more than half of his earnings, surely not a preposterous conclusion.

It follows that the verdict could not be found to be clearly excessive.

*Judgment on the verdict.*

All concurred.